## NATIONAL LABOR RELATIONS BOARD v. VARE et al.

### No. 11011.

United States Court of Appeals
Third Circuit.

Argued May 19, 1953.

Decided July 21, 1953.

544

Maurice Alexander, Washington, D. C. (George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Assistant General Counsel, Frederick U. Reel, Attorney, National Labor Relations Board, Washington, D. C., on the brief), for appellant.

Frederick H. Knight, Philadelphia, Pa. (Miles W. Kirkpatrick, Norman R. Dutton, and Morgan, Lewis & Bockius, Philadelphia, Pa., for McCarron Co.; Edward Davis, Philadelphia, Pa., for International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local Union 470, AFL, on the brief), for respondents.

Before MARIS, STALEY and HASTIE, Circuit Judges.

STALEY, Circuit Judge.

This is a petition by the National Labor Relations Board for enforcement of its order requiring the respondents, McCarron Co. and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local Union 470, AFL, to cease and desist from the commission of certain unfair labor practices and requiring the company to offer reinstatement to one George Paytas and, jointly and

severally with the union, to make him financially whole.[1]

A history of the present company and its predecessors is necessary to a determination of what we consider the dispositive issues.

Paytas was hired as a truck driver by Charles McCarron in October of 1948. When Paytas was hired, Charles McCarron was the sole proprietor of the business, engaged principally in hauling dirt from excavations to fill sites or dumps in the Philadelphia area. His services were performed almost exclusively for Vare Brothers, a partnership consisting of George A. Vare and Edwin H. Vare, Jr., specializing in the installation and maintenance of aerial and underground electric cables. The latter firm performed a substantial amount of work each year for the Philadelphia Electric Company, a public utility engaged in interstate commerce. In August of 1949, after Paytas had worked for about ten months, Charles McCarron died. His executors took over and operated the business, all the while attempting to sell it as a going concern. The business was operated by the estate from August of 1949 until March 31, 1950, when actual operation and control were taken over by the Vare brothers, under the name of McCarron Co., pursuant to an agreement of sale between the executors and the Vares. Another agreement between the same parties granted to the Vares the right to use the name "McCarron." The assumed name "McCarron Co." was duly registered under the Pennsylvania Fictitious Names Act. This trucking business was operated in substantially the same manner by each of the three proprietors: Charles McCarron as an individual, the estate of Charles McCarron, and the Vare brothers' firm, doing business as McCarron Co.

Paytas testified that from the inception of his employment by Charles McCarron until he was allegedly discharged in April of 1950, he was given less than full-time work because he was unable to get a union book. Daily work assignments were made on a seniority basis, but all those drivers with union books, whether hired before or after Paytas, would be sent out first. Then, if there were any jobs left, he would be sent out. If there were only enough assignments for drivers with union books, he would go home. His testimony in this respect was confirmed by that of Otto P. Becker who was the bookkeeper for Charles McCarron, and manager and bookkeeper for the estate and for McCarron Co. as presently organized. Becker said that the plan described by Paytas was followed under each of the three owners and was a well-defined policy even though there was no union-security contract in effect.

Paytas had been a member of the union in good standing for some time, but in 1943 had stopped paying dues. On quite a few occasions after being hired by Charles McCarron, he had attempted, unsuccessfully, to acquire a union book, proposing that he pay the back dues by installments and stating he was unable to comply with the union's insistence that he pay the back dues in a lump sum.

The culmination of this discriminatory treatment came on April 28, 1950, when, Paytas says, he was told by Becker that he was not wanted any longer because he did not have a union book. Considering himself discharged, he did not report for work again.

On August 14, 1950, Paytas filed the original charges, the one against the union alleging, in substance, that in February and March of 1950 it caused the Charles McCarron Co. to discriminate against him in violation of Section 8(a)(3) of the Act in that employment was denied him because of his failure to join the union. The original charge against the company alleged that the Charles McCarron Co. refused to give him full-time employment in February and March of 1950 because he had been unable to get a work permit from the union.

No complaint was issued upon the basis of these charges since the board had no jurisdiction over the activities of Charles

---

1. The board's decision and order appear in 100 N.L.R.B. No. 13 (1952).

McCarron as an individual or over his estate because neither firm was in commerce within the meaning of the Act.

On June 12, 1951, Paytas filed an amended charge against each respondent. The amended charge against the company is as follows:

"McCarron Co., a partnership consisting of George A. Vare and Edwin H. Vare, Jr., co-partners, through its officers and agents, deprived George Paytas of full time work from on or about April 1, 1950, to on or about April 28, 1950; terminated his employment on or about April 28, 1950, has failed and refused to reinstate him to his former job or to a substantially equivalent job since April 28, 1950, all because he was not a member of International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local Union 470, A.F.L., in good standing; by these and other acts, including questioning of Paytas as to his union affiliation, the urging of Paytas to join said Union, and the threatening loss of benefits or employment to Paytas unless he should join said Union, it interfered with, restrained and coerced employees in the exercise of rights guaranteed in Section 7 of the Act."

The following is the amended charge against the union:

"The above union, through its officers and agents, on and after April 1, 1950, caused and attempted to cause the McCarron Co., employer of the charging party, to discriminate against him in violation of Section 8(a) (3), with respect to his hire, tenure and conditions of employment."

Against this background, the company and union argue, as they did before the board, that the complaint should have been dismissed because issued in violation of that part of Section 10(b) of the Act which provides that "* * * no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made * * *." 48 Stat. 926 (1934), as amended, 62 Stat. 991 (1948), 29 U.S.C.A. § 160 (b). The trial examiner was impressed by this argument and recommended dismissal of the complaint. The board, one member dissenting, disagreed with the trial examiner and, reaching the merits, concluded that the company had violated Section 8(a) (3) and (1) and that the union had violated Section 8(b) (2) and (1) (A). We do not consider the merits of the case for we think that the trial examiner was right and the board wrong. Unless the cases have taken all the teeth out of the six-months limitation provision of Section 10(b), it must operate to require dismissal here.

Many cases have construed Section 10(b) to allow untimely amendments to timely charges when the amendments "relate back" or "define more precisely" or "bring up to date" the unfair labor practices alleged in the timely charge. National Labor Relations Board v. Epstein, 3 Cir., 1953, 203 F.2d 482, and cases there cited. To fit within that rationale, however, the untimely charge must be, at least, an "amendment." The "amended" charges here are really new and different charges alleging new and different unfair labor practices against a new and different respondent.

The original charge against the company named the employer as the Charles McCarron Co. No such company ever existed. Charles McCarron operated his business as a proprietorship, and his executors operated in the name of the estate. McCarron Co. came into existence only when the Vares took over control on April 1, 1950. The original charge alleged that the employer refused to give Paytas full-time work in February and March of 1950. In February and March of 1950, the business was being operated by Charles McCarron's executors as part of his estate. Thus, the acts complained of occurred prior to the appearance of the Vare brothers' firm, McCarron Co., and, if committed, were committed by the McCarron estate. Furthermore, Paytas was discharged on April 28, 1950, so that, when he filed the

original charges on August 14, 1950, he was fully aware of all the unfair acts committed against him. Consequently, this is not a case of unfair labor practices of a continuing nature which were merely brought up to date by the amended charges. Cf. National Labor Relations Board v. Epstein, supra.

The amended charge against the company, filed June 12, 1951, names the employer as "McCarron Co., a partnership consisting of George A. Vare and Edwin H. Vare, Jr., copartners; (2) Vare Brothers, a partnership consisting of George A. Vare and Edwin H. Vare, Jr., copartners." This is a definite change in employers. The original charge obviously charges the estate with the commission of the unfair labor practices since it specifies February and March of 1950 as the time when the acts were committed, and the estate, not the Vare brothers as McCarron Co., was operating the business during those months. The original charge alleged unfair labor practices committed in February and March of 1950, while the amended charge alleged unfair labor practices committed in April of 1950. The original charge alleged that the employer refused to give Paytas full-time work because he did not have a union work permit. The amended charge alleged a discriminatory discharge, refusal to reinstate, interrogation, and threats. Hence, aside from the fact that the amended charge names a different employer, the unfair labor practices alleged are much broader and of a different character than those in the original charge.

But, we are told, it would be unrealistic to expect a truck driver to master technicalities of pleading which often escape a lawyer. Paytas simply made a mistake. He really meant to charge the present company but erroneously added "Charles" to what should have been merely "McCarron Company." Therefore, the argument continues, this is a case of misnomer, which may be corrected by an untimely amendment. This is the heart of the board's reasoning in its decision disagreeing with the trial examiner.

We cannot accede to the conclusion that this is a case of misnomer. We think Paytas knew what he was doing when he filed the original charges and succeeded in doing what he intended to do: charge the union and the McCarron estate with the commission of unfair labor practices. This is shown conclusively by the following facts. He was discharged, he says, on April 28, 1950, by the present company, and he filed the original charges in August, nearly four months later, and yet he alleged only the refusal to give full-time work, which act was committed by the McCarron estate, and did not allege the discriminatory discharge, which was committed by the present company. One would think that, if he intended to charge the present company, he would have included the discriminatory discharge. In August of 1950, he was certainly aware of both unfair acts, and a discriminatory discharge is not such a trivial event in the life of a working man as would likely be overlooked when filing a charge. Consequently, we are convinced that by alleging in the original charge acts committed by the McCarron estate and by omitting a more important act committed by the present company, Paytas was not mistakenly trying to charge McCarron Co. When he wanted to charge that company, he did so quite clearly, but June of 1951 was eight months too late. The trial examiner put the matter very nicely:

"I have examined the authorities cited by the General Counsel, but I cannot agree that those cases authorize this alleged amendment of the charge, and the issuance of these complaints. The gist of the question here is not of a lack of specificity in a charge which is later amended, nor is it the addition of names to an existent charge, nor is it that the Respondent has been sued under a misspelled name, or in the wrong name, nor is it that McCarron Co. is the alter ego, subsidiary or successor of McCarron or his estate. Here, the amendment charges George A. Vare and Edwin H. Vare, Jr., as McCarron Co. and as Vare Brothers, with a whole group of unfair labor practices, for the *first time on June 12, 1951,* which were committed *April 1–28, 1950.* If

Section 10(b) is to be given any meaning as a statute of limitation, it must certainly bar this procedure. I cannot see how a charge against the McCarron Estate preserves the timeliness of the charge against the Brothers Vare, especially when the matters charged against the Brothers Vare are entirely different, and occurred at a time different from the charges against the McCarron Estate. Here, the General Counsel seeks not to make a successor employer remedy the unfair labor practice of a predecessor employer, but seeks to make a *new employer remedy his own unfair labor practices,* committed, however, *14 months prior to the filing of a charge against that employer."* (Emphasis in original.)

■ Thus, the so-called amended charge against the company, being in reality an original charge, was not timely filed. The complaint was, therefore, issued in violation of the limitation provision of Section 10(b) and must be dismissed.

■ The same reasoning requires a like result as to the complaint against the union, even though it was correctly designated in both charges, because, at the very least, the amended charge accused it of new and different unfair labor practices since it alleged collusion with a different employer.

■ There is, however, another reason for our decision. The original charges recited acts over which the board concedes it had no jurisdiction because the McCarron estate was not engaged in, nor did it affect, interstate commerce within the meaning of the Act.[2] Even on the board's theory, it acquired jurisdiction only after the Vare brothers took over on April 1, 1950.[3] Thus, the original charges could not have sustained a valid complaint, and we are unable to understand how they could be vitalized by an amendment, timely or otherwise. In legal theory, there was nothing to amend. A charge correcting the difficulty would not have been amendment but an entirely new charge. That is exactly what happened here, but the second charge was filed too late.

■ In Ferro Stamping and Manufacturing Co., 1951, 93 N.L.R.B. 1459, 1463, a case involving Section 10(b), the board laid down a rule which emphasizes the basis for our decision here. "It follows therefore that *once the Board's jurisdiction is properly invoked by the timely filing and service of a charge,* any unfair labor practices thereafter committed by a respondent and

2. The following colloquy between Mr. Summers, counsel for the General Counsel, and Mr. Dutton, counsel for the company, appears at pages 347–348 of the transcript of testimony:

"Mr. Summers: You do understand, do you not, that we do not contend that Charles McCarron Company or the estate of Charles McCarron is engaged in commerce within the meaning of the Act? You understand that, do you not?

"Mr. Dutton: No, I do not.

\* \* \* \* \* \*

"Mr. Summers: I would be willing to stipulate that neither Charles McCarron, the individual, or any firm which he operated as an individual proprietorship or his estate and the company which his estate operated was in interstate commerce. I do not contend that any of those were in interstate commerce. That is the reason why they are left out of the complaint."

The same concession is made on page 23 of the board's brief in this court.

3. Although the board admits that it had no jurisdiction over Charles McCarron as an individual nor over his estate because neither was engaged in commerce within the meaning of the Act, it asserts jurisdiction on the following theory over the activities of the business as presently organized. McCarron Co., from April to November, 1950, furnished Vare Brothers with hauling services valued at about $95,000, virtually all of which services were rendered on behalf of Vare Brothers to the Philadelphia Electric Company, a public utility engaged in commerce within the meaning of the Act. The board contends that the firm Vare Brothers and the firm McCarron Co. are, for purposes of labor relations, essentially one employer. Since that employer furnished services valued in excess of $50,000 to a public utility engaged in interstate commerce, the board says that the employer is within its jurisdiction.

uncovered while the charge is being investigated becomes cognizable by the Board and may be included in the complaint." (Emphasis supplied.) We agree, but that lays bare the error here: The board admits that its jurisdiction was not invoked by the original charges. Thus, an amendment to those charges alleging acts committed at a time when the board did have jurisdiction is really a new charge and, since it was filed outside the six months allowed by Section 10(b), cannot sustain a complaint.

The order of the board will be set aside.