**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**STAFFORD TRUCKING, INC., Respondent.**

**No. 15276.**

United States Court of Appeals Seventh Circuit.

April 19, 1966.

Walter S. Davis, Hoebreckx, Davis & Vergeront, Milwaukee, Wis., O. S. Hoebreckx, Milwaukee, Wis., of counsel, for respondent.

Before DUFFY, KILEY and SWYGERT, Circuit Judges.

KILEY, Circuit Judge.

The Board's petition seeks enforcement of its order [1] finding respondent guilty of violations of Sections 8(a) (1) and 8(a) (3) of the National Labor Relations Act, 29 U.S.C. § 158.[2] Respondent does not challenge the finding as to the 8(a) (1) violation.[3] We deny enforcement of the order based on the 8(a) (3) violation with respect to employee Toivonen, and order enforcement as to employees Lowitz and Immel.

Respondent in 1963 was in the trucking business in Portage, Wisconsin, employing "about" twelve truck drivers, including Toivonen, Lowitz and Immel. Late in June of that year, at Immel's request, Union [4] activity was begun to organize the employees. After a meeting on June 22, 1963, of the employees and Union representatives, the Union filed a representation petition. A Direction of Election was issued on August 19, making all employees on the payroll for the period prior to August 19 eligible to vote. The mail ballot was counted on September 26, and the Union was selected as bargaining agent. The alleged § 8(a) (3) discriminatory conduct involves the discharges of Immel and Lowitz, and the failure to reinstate Toivonen—all in the period be-

---

Marcel Mallet-Prevost, Asst. Gen. Counsel, Warren M. Laddon, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Allison W. Brown, Jr., Walter Meyer, Attys., N. L. R. B., Washington, D. C., for petitioner.

---

1. Stafford Trucking, Inc., 150 N.L.R.B. No. 107 (1965).

2. 29 U.S.C. § 158. Unfair labor practices
    (a) It shall be an unfair labor practice for an employer—

    (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

    \*    \*    \*    \*    \*

    (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization \* \* \*.

3. As stated by the Board, Jack Stafford, respondent's president, violated § 8(a) (1) "by interrogating and threatening employees because of their union activity and by threatening to enforce Company rules more strictly and to discharge employees for any infraction thereof if the Union became bargaining representative." Drivers Lowitz and Immel were among those interrogated.

4. Drivers, Salesmen, Warehousemen, Milk Processors, Cannery, Dairy Employees and Helpers Union, Local 695, Affiliate of International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

tween the Union meeting and the direction of an election.

The question for us is whether there is substantial evidence on the record as a whole to support the findings that Lowitz, Immel and Toivonen were unlawfully discharged and that the reasons assigned by respondent for the discharges were "pretexts" to shield the motive based on their Union activities. NLRB v. Economy Food Center, Inc., 333 F.2d 468, 471 (7th Cir. 1964). While the issue of the 8(a) (1) violation is not before us, the anti-Union attitude implicit in that violation may be considered as a background against which the events occurred.

The three employees involved here attended the June 22, 1963, Union meeting. Clifford and Wilcy Stafford, sons of respondent's president, Jack Stafford, attended also, but were asked to leave and did so.

The Trial Examiner credited Lowitz' testimony that the night before the meeting President Stafford had interrogated him, accused him of being one of the Union instigators, and criticized him for his Union activities; threatened loss of working time for the employees and personal surveillance of their driving and lunching conduct; and threatened to have Lowitz fired because he was an insurance risk. To some extent Stafford corroborated Lowitz' testimony. Stafford testified he discharged Lowitz "because of the insurance."

It is true that Lowitz had a poor driving record and his license was suspended for sixty days in the autumn of 1962. But he resumed work as a truck driver in December of 1962 and continued driving until his discharge. It is true also that in March, 1963, Stafford's "third" successive insurer wrote Stafford's agent, asking to be relieved of liability under the policy, citing three large losses on accidents,[5] and observing that Lowitz and employee Wakeman had fallen asleep at the wheel and "it appears that this is an occupational hazard in this risk because of the unusual hours they keep." Respondent's insurance agent in late June or early July requested insurance reports on five drivers, and these reports, dated July 9, 1963, indicated that the driving records of both Lowitz and Wakeman were "generally unacceptable." Lowitz was told the insurance risk was the reason for his discharge. But the reports were not dated until two days after the discharge on July 7, and Wakeman continued working after Lowitz' discharge. In addition, when Lowitz' license had been suspended in late 1962, he was retained on the payroll by respondent. His driving record, since recovering his license and again driving for respondent, was "without blemish." The Examiner concluded and the Board agreed that respondent discriminatorily discharged Lowitz in violation of § 8(a) (3) and (1) of the Act.

Immel began working for respondent in February, 1963. His testimony was substantially as follows: He started the Union activity and passed out cards to the employees. Stafford late in the night before the June 22 Union meeting asked Immel if he was going to the meeting and impliedly threatened him with reduction of working hours and said "I don't know what you are going to do but I know what I'm going to do." On Tuesday, August 13, Immel was sick and had his wife call respondent's office, and he heard her say that he was "sick and * * * felt weak and had a headache and * * * felt faint like," and wanted the afternoon off to see his doctor.[6] That afternoon,

5. Robert Stafford, forced off road ($3,-730.95); Lowitz, June 25, 1962, fell asleep and rear-ended claimant ($2,425.-00); and Don Wakeman, January 25, 1963, fell asleep and struck claimant ("appears that this loss will cost us several thousand dollars").

6. Mrs. Immel testified that she told the respondent's mechanic, who answered the phone, that her husband "had fainted." After visiting the doctor with her husband, she phoned again and told Clifford Stafford their doctor said Mr. Immel was sick from over-exhaustion and the flu. Clifford made no reference to Immel fainting on any other occasion.

their Doctor Cooney told him he was "coming down with the flu" and to take the rest of the week off and "get rested up." On Sunday, August 18, upon reporting to respondent that he wanted the next day off to go to his grandmother's funeral, Immel was told by Clifford Stafford that he could not return to work without a doctor's release so that respondent could find out why he "was fainting all the time." The following Tuesday Dr. Cooney gave him the release authorizing his return to work.

The testimony continues: Clifford Stafford rejected the release and told Immel that President Stafford wanted him to be examined by Dr. Henney, Stafford's own doctor, at the same clinic as Dr. Cooney. This doctor asked him about his "fainting spells." Immel denied having had any. The doctor asked him if "we were having any union problems at the company." Dr. Henney certified that Immel was ready for work. President Stafford refused to reemploy him, stating he wanted Immel to go to Madison to determine whether he had a brain tumor, "then you can come back to work." [7]

Immel did not go to the Madison hospital and accordingly could not return to work. He could not afford the cost of this examination, and was not assured that anyone else would pay for it. [8]

It is true that on one previous occasion he had run his car into a ditch and the night before that event had "passed out" in the Stafford garage. He denied that he had fainted, but stated he had gotten sick both times from driving a truck with a bad piston which resulted in diesel smoke and fumes in the truck cab. This

was possible, according to testimony of Dr. Henney. The Examiner credited Immel on this factual question whether Immel had "fainted" or had "fainting spells" or, as Jack Stafford told Dr. Henney, "blackout spells" which worried Stafford about his driving. The Examiner, noting also respondent's "strong feeling against the Union," concluded, and the Board agreed, that respondent discriminated against Immel in violation of § 8(a) (3). [9]

Toivonen went to work for respondent on May 6, 1963, signed a Union card and attended with the other drivers the June 22 meeting. He and two other Stafford drivers, all lowest in seniority and residing in Hurley, Wisconsin (about 235 miles from Portage), were laid off for lack of work on June 29, 1963. The other two were called back two weeks later, after a week's notice. It is conceded that the layoff was justified and there is no claim that Toivonen was their senior, entitled to recall before them. Respondent did not communicate with Toivonen until Sunday afternoon, August 11, when Clifford Stafford called Toivonen at his home in Hurley and asked him to come back to drive a truck to Appleton "that night." Toivonen said he had no transportation to Portage, since his car was not operative. He testified that Clifford Stafford did not suggest that he drive down on Monday with another of the drivers from Hurley, but that Clifford said "we will figure something out." The following week another part-time employee, who had no part in the Union organizing activities, was assigned to full-time work Toivonen would otherwise have had. The Examiner found that respondent did not

7. Immel denied that Mr. Stafford ever told him he could come back to work after a neurological examination in Madison and a "clean bill of health."

8. Immel testified Jack Stafford told him he could draw workmen's compensation to pay for the examination. Dr. Henney thought, at the Examiner's hearing, that the cost of the examination might not exceed $100.00.

9. The Trial Examiner's recommended order notes that respondent, at the hearing, offered to reinstate Immel if and when he would submit to a physical examination at respondent's expense in Madison, and if said examination results in his being certified "physically able to resume his job as a truckdriver." The order states that Immel indicated his acceptance of respondent's offer. On oral argument, counsel for respondent informed this court that Immel has since taken the examination and been reinstated.

tell him he was to be taken back full-time.[10]

The Examiner concluded from the testimony that Toivonen was not recalled because it was respondent's purpose "to replace him with a man not tainted by the Union" in order to eliminate a possible pro-Union vote at the impending representation election.

The record shows that the two men who were laid off with Toivonen were also from Hurley and with him had commuted weekends from Portage to Hurley. They also had signed Union cards and attended the meetings.

Clifford Stafford testified that he suggested to Toivonen that he ride down with the other two men on Monday and that Toivonen said he had work to do on his house and "stuff" about his car to straighten away and he could not come down for about a week. Clifford testified that he "figured it out, if he [Toivonen] didn't come down he could stay up there, then I wouldn't need him." There was testimony too that Mrs. Toivonen was unhappy about her husband's being away so much, and that Clifford Stafford stated to one of the other two drivers that "they were not going to beg" Toivonen to come back to work. Toivonen testified he considered himself fired when he heard about this the following week. He never heard again from respondent.

Toivonen testified further that he "might have been working a little around the house" that week and that "I might have" mentioned that to Clifford Stafford over the phone. He also testified that his wife was a "little disgusted," that he told Jack Stafford he might have to leave work because he could not find a home and that he "mentioned" he did not know how long he would be able to stay on. On August 11 he did not ask either of his fellow workers whether he could ride down to Portage with them, and he said he tried to reach Jack Stafford in Mil-waukee several times on that Sunday, but did not call Monday or any other time.

We think the record as a whole does not substantiate the inference drawn by the Examiner with respect to Toivonen. The record discloses at best a passive attitude on his part toward returning to his work, and that he had domestic problems which were probably at the root of his attitude. And if respondent was interested in eliminating possible pro-Union votes, why would it select and fail to reinstate him, instead of his two fellow townsmen, who had also attended the Union meeting?

As to Lowitz and Immel, we think there is substantial evidence on the record as a whole to support the Examiner's findings and the Board's decision.

The order as to Lowitz and Immel will be enforced; and as to Toivonen enforcement will be denied.[11]

---

10. Clifford Stafford denied this, and Jack Stafford testified that they would not call Toivonen back, when his home was 235 miles away, just for "one run or two."

11. Paragraph 1(d) of the order was inadvertently not deleted by the Board, but enforcement was not sought in this case.