369 F.2d 226
 PLASTIC WORKERS UNION LOCAL 18, INTERNATIONAL UNION, DOLL
AND TOY WORKERS, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
SINKO MANUFACTURING AND TOOL COMPANY and Sinko Division of
MSL Industries, Inc., Respondents.
 Nos. 14958, 15390.
 United States Court of Appeals Seventh Circuit.
 Nov. 17, 1966.
 
 Sherman Carmell, Sheldon M. Charone, David R. Loewenberg, Carmell & Charone, Chicago, Ill., for Plastic Workers Union and Toy Workers, AFL-CIO.
 John H. Rockwell, Donald A. Mackay, Leibman, Williams, Bennett, Baird & Minow, Chicago, Ill., for respondents Sinko Mfg. & Tool Co., and Sinko Division of MSL Industries, Inc.
 Marcel Mallet-Prevost, Asst. Gen. Counsel, Peter Giesey, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Elliott Moore, Atty., N.L.R.B., for National Labor Relations Board.
 Before KNOCH, KILEY and FAIRCHILD, Circuit Judges.
 KNOCH, Circuit Judge.
 
 
 1
 The petitioner, Plastic Workers Union Local 18, International Union, Doll and Toy Workers, AFL-CIO, hereinafter called 'Plastic,' seeks to set aside the order of the National Labor Relations Board, issued against Sinko Manufacturing and Tool Company and Sinko Division of MSL Industries, Inc., its successor, respondents, hereinafter called 'Sinko,' (reported at 149 NLRB 201) directing Sinko, inter alia, to withdraw and withhold recognition from Plastic unless that union shall be certified by the Board as representative of Sinko's employees, and to reimburse employees for all dues collected. The Board seeks enforcement of its order. The two cases were consolidated.
 
 
 2
 Sinko negotiated a collective bargaining agreement with Plastic, which included a union security clause requiring all employees to become and remain members after 30 days' employment.
 
 
 3
 The contract was executed after examination of authorization cards submitted by Plastic on August 30, 1961. There is some question as to the exact numbers of cards and the dates of signatures. However, at a hearing, Plastic produced numerically sufficient cards dated prior to August 30 to constitute a majority.
 
 
 4
 Most of the cards, however, were secured by one Dewey Carson whose relation to Sinko's supervisory structure is the critical issue. The Board found that he was a supervisor and that Plastic did not, therefore, represent an uncoerced majority of Sinko's employees.
 
 
 5
 The Trial Examiner had found violations of 8(a)(1), (2) and (3) of the National Labor Relations Act (Title 29 U.S.C. 151 et seq.) by requiring certain employees to join Plastic as a condition of continued employment without affording them the required 30-day grace period. The Board came to the same conclusion.
 
 
 6
 As to these individuals, Sinko concedes that reimbursement of their first month's dues is proper. Enforcement of the Board's Order with respect to reimbursement of the first month's dues to those employees not afforded the required 30-day grace period is hereby granted.
 
 
 7
 The supervisory or employee status of any individual is primarily a question of fact. N.L.R.B. v. Elliott-Williams Co., 7 Cir., 1965, 345 F.2d 460, 463.
 
 
 8
 The Trial Examiner did not find that Carson was a supervisor. The Board claims not to have disturbed any of the Trial Examiner's credibility determinations, but only to have disagreed with him as to inferences drawn from established facts and the conclusions of law thereon, thus depriving his recommendations of any special weight. Universal Camera Corp. v. N.L.R.B., 1951, 340 U.S. 474, 490-496, 71 S.Ct. 456, 95 L.Ed. 456; J. I. Case Co. v. N.L.R.B., 7 Cir., 1958, 253 F.2d 149, 155-156, where the facts were undisputed. We cannot agree.
 
 
 9
 The Board concluded that Carson had been represented to his fellow employees as a supervisor, authorized to direct fellow employees in a manner requiring independent judgment as a supervisor and agent of the employer within the meaning of the Act. The Board concluded that after Carson solicited a majority of the employees to join or authorize Plastic to represent them, Sinko violated 8(a)(1), (2) and (3) by entering into a collective bargaining agreement on the basis of that majority.
 
 
 10
 Dewey Carson worked in Sinko's warehouse along with six or seven other employees. The Board lays great stress on such items of evidence as the following:
 
 
 11
 Donald Downs, foreman of the warehouse division from January, 1961, to March 17, 1961, testified that Carson was 'in charge' of the finished goods section, i.e. storing finished products and cartons and grinding. He said that he was told that by Plant Manager Jack Condran when he was moved into the warehouse and was assigned to setting up an inventory and straightening out the warehouse. Downs testified that he was Carson's boss and he told Carson what duties he wished performed on a day-to-day basis. When overtime was occasionally authorized for the finished goods section by the plant manager, Downs said he let Carson pick out the men who would work. Evidently working overtime was a matter of choice and employees felt free to refuse when they were selected. A later foreman, Salvador Ingratta, who succeeded Downs, made his own choice of overtime workers, but sometimes announced them through Carson. He also testified that he would send the first man he could get a hold of, frequently but not always Carson, to take his orders to the warehouse employees. Downs testified that he had trouble with one man who would not 'recognize anything' Carson told him, and Downs informed that employee that as far as Downs was concerned the man worked in Carson's section and took orders from him.
 
 
 12
 Norman Patrick testified that when he went to work as a jeep driver early in August, 1961, the then foreman, Ingratta, introduced Carson as the assistant foreman whose orders were to be followed in the warehouse. Robert Bartley, who came to work in March, 1961, testified that when he posed questions about the work to foreman Ingratta, he was told to ask Carson, that Carson was Ingratta's assistant. Patrick also testified, however, that he himself showed Bartley what to do when Bartley was a new employee, which would lend support to the assertion that it was customary for senior employees to instruct newer employees. John Looney testified that he worked at Sinko for about five months beginning in March, 1959, and again from about July through October, 1961. He said that Carson told him which jeep driver to help and showed him where stock was stowed, that Carson or Ingratta, whichever was 'handy' would sign bills of lading. However, he seldom worked the same shift as Carson and observed him mainly during the overlapping of shifts or when he arrived early.
 
 
 13
 On one occasion when John Looney asked Ingratta for a transfer back to the day shift, Carson was asked if he would take on a new jeep driver so that a threeway transfer could be made to put Looney on the day shift. Carson had said that he didn't want to train another new man, whereupon Ingratta told Looney that the transfer would not work. This incident occurred after the contract was signed and so could not have misled any other employees as to Carson's status. On another occasion Carson had told a sick employee, George McCoy, to go home.
 
 
 14
 Carson also distributed pay checks, which the Board states was a function of supervisors, but the testimony shows that there was no set policy that supervisors alone would distribute pay checks. The Board relies on a payroll listing of Carson as '6' (which was changed to '10' in October, 1961), as showing supervisory status. A code breakdown had been furnished in response to request of the general counsel. This was a mimeographed form taken from the accounting department. The Sinko treasurer, Howard Nielson, was not sure who had originally drawn it up. This sheet showed '6' as indicative of supervisor. A number of supervisors were coded '6', but not all of the supervisors. Nielson stated that Carson was not a supervisor and never should have been listed as such; that he was told that '6' was being used to indicate those who passed out pay checks. Evelyn Skomer, bookkeeper for Sinko, testified that she changed Carson's code to '10' in June, 1961, when Ingratta told her that he would pick up the pay checks for the warehouse, but that through error the old code continued to be listed until the error was caught in October. She testified that a similar error occurred with respect to another man. She explained that she initially used '6' to indicate foreman or assistant foreman, but that when she became office manager and the code was not being used by the cost accounting department, she used '6' for distribution of pay checks, giving the '6' code to the foreman or to the oldest employee in a department.
 
 
 15
 Carson evidently posted two notices. He was assigned to handle 'safety'. One witness testified to seeing a warning to use goggles when using the grinder which bore the word 'supervision' as a signature in what the witness said was Carson's printing. Another notice calling a meeting of jeep drivers was signed with Carson's name in what the witness recognized as Carson's printing.
 
 The Act defines a supervisor as:
 
 16
 '* * * any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.' Title 29 U.S.C. 152(11).
 
 
 17
 The Board relies a great deal, as indicated above, on statements viewed out of context. The fact is that Carson, as the employees saw, performed the same duties as the other warehouse employees. He punched a time clock. He was paid an hourly wage with time and a half for overtime. He swept floors. He burned garbage. He worked the grinder. He unloaded trucks. Sinko foremen did not perform these tasks. He assisted other employees but he did not criticize them. He had no desk and attended no foreman meetings as a foreman. His locker was with those of the other warehouse employees. He was paid a little more than most, but the Trial Examiner found that he had periodic increases based on seniority. The skills required of him were of a low level.
 
 
 18
 When Salvador Ingratta became foreman in March, 1961, more than five months before the authorization cards were obtained, he was devoting much of his time to establishing the inventory system. He used other employees, including Carson, to transmit his orders. He testified that employees did come back to him to complain that some employees refused to honor these messages and that he told the warehouse employees:
 
 
 19
 'I don't care who tells you. If they say I want you to do it, you do it. I don't have time to chase you all over the place.'
 
 
 20
 The Trial Examiner found that by mid-June, 1961, when the inventory system was completed, foreman Ingratta had little or no further need to rely on Carson. One fellow-employee said that he considered Carson 'something like a handy man.'
 
 
 21
 With respect to those outside the warehouse from whom the majority of the cards were secured, there is no evidence at all that Carson was regarded as a supervisor.
 
 
 22
 Viewed in the context of the whole record we find no support for a finding that Carson was other than a senior employee, leadman or straw boss carrying out routine instructions which did not require the exercise of independent judgment, and not a supervisor within in the meaning of the Act. N.L.R.B. v. Majestic Weaving Co., 2 Cir., 1966, 355 F.2d 854, 858; Tele-Trip Co., Inc. v. N.L.R.B., 4 Cir., 1965, 340 F.2d 575, 579. Performance of isolated, infrequent duties of a supervisory nature does not transform a rank and file employee into a supervisor. N.L.R.B. v. Stewart, 5 Cir., 1953, 207 F.2d 8, 10 and cases there cited.
 
 
 23
 There is no evidence of actual coercion of employees or circumstances from which coercion can be inferred. Jefferson Electric Co. v. N.L.R.B., 7 Cir., 1939, 102 F.2d 949, 956; Chicago Rawhide Mfg. Co. v. N.L.R.B., 7 Cir., 1955, 221 F.2d 165; Continental Distilling Sales Co. v. N.L.R.B., 7 Cir., 1965, 348 F.2d 246. Nor was there any evidence to suggest that Carson told employees that Sinko wished them to sign the cards. Carson told at least one employee that he was being paid by Plastic to secure cards.
 
 
 24
 Enforcement of the Board's order insofar as it requires withdrawal of recognition of Plastic and refund of dues, beyond those mentioned above for the first month, is denied.
 
 
 25
 We have considered all other points and authorities to which our attention has been invited but find them insufficient to alter our opinion.
 
 
 26
 Enforcement denied in part, granted in part.