**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**STAFFORD TRUCKING, INC., Respondent.**

**No. 15709.**

United States Court of Appeals Seventh Circuit.

Dec. 27, 1966.

Rehearing Denied Feb. 3, 1967 en banc.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Theodore Martineau, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Gary Green, Atty., N. R. L. B., for petitioner.

Walter S. Davis, Milwaukee, Wis., Hoebreckx, Davis & Vergeront, Milwaukee, Wis., John G. Vergeront, Milwaukee, Wis., of counsel, for respondent.

Before HASTINGS, Chief Judge, and FAIRCHILD and CUMMINGS, Circuit Judges.

CUMMINGS, Circuit Judge.

This case is here on the National Labor Relations Board's petition under Section 10(e) of the National Labor Relations Act (29 U.S.C. § 160(e)) to enforce an order against respondent. See 154 N.L. R.B. No. 99. Earlier this year, we considered a related case against this same respondent. That proceeding is reported in 7 Cir., 359 F.2d 829 and 150 N.L.R.B. 1036 and will be termed *Stafford I* herein.

Respondent Stafford Trucking, Inc. ("Stafford") is a Wisconsin corporation with its principal office in Elm Grove, Wisconsin, a suburb of Milwaukee. It is engaged in the business of local and interstate hauling by truck, with its dispatch office and garage located in Portage, Wisconsin. The Board concluded that Stafford's January 30, 1964, discharges of its employee-drivers Daniel Immel and Donald Becker were discriminatory discharges forbidden by Section 8(a) (3) of the Act (29 U.S.C. § 158(a) (3)). The Board also concluded that Stafford refused to bargain collectively with the Union [1] by unilaterally instituting a contributory insurance plan in contravention of Section 8(a) (5). These two violations led the Board to conclude that Stafford had engaged in unfair labor practices within the meaning of Section 8(a) (1) of the Act (29 U.S.C. § 158(a) (1)).

In June 1963, Immel led a unionization effort among Stafford's 12 truck drivers, resulting in a meeting between the employees and representatives of the Union on June 22, 1963. The night before the meeting, Jack Stafford, owner and president of respondent, asked Immel whether he planned to attend the meeting. He replied in the affirmative. Mr. Stafford then asked if Immel could live on only 40 hours a week. On the same night, Mr. Stafford threatened several of his employees with discharges for violating Company rules if they should join the Union.

After the June 22, 1963, meeting of the employees and Union representatives on August 19th, the Board's Regional Director issued a Direction of Election, making all employees on the payroll for the period prior to June 19th eligible to vote. The election was held on September 26th, but the outcome was in doubt because Stafford challenged the ballots of drivers Immel, Becker, Lowitz and Toivonen (see 150 N.L.R.B. at p. 1037, note 3). Immel had been discharged on August 19th, Becker on July 23rd, Lowitz on July 7th,

---

1. Drivers, Salesmen, Warehousemen, Milk Processors, Cannery, Dairy Employees, and Helpers Union, Local 695.

and Toivonen had allegedly been refused re-employment on August 12th.

In October 1963, Immel and Becker gave testimony against respondent in *Stafford I*. In that proceeding, the Board found that Immel and Lowitz had been discriminatorily discharged and that Toivonen had been discriminatorily refused re-employment. However, the Board concluded that Stafford had discharged Becker for failing to remove a binder chain that had fallen from the conveyor on the rear of his truck into a sand bin belonging to a customer of Stafford, and that Becker's discharge was not for his Union activities. Becker was rehired on August 23, 1963. Immel was rehired in November 1963. In *Stafford I,* this Court held there was substantial evidence to support the Board's findings that Immel and Lowitz were unlawfully discharged, but that there was no substantial evidence to support the Board's holding that the failure to reinstate Toivonen was unlawful. 359 F.2d 829.

On January 8, 1964, the Board ruled that the four challenged ballots should be counted and therefore certified the Union as the exclusive bargaining representative of Stafford's employees. Three weeks thereafter, Immel and Becker were discharged the second time. Jack Stafford's stated reason for firing them was their driving truck 15 at 55 miles per hour, in contravention of respondent's rule that its trucks should not be driven in excess of 50 miles per hour.

The refusal to bargain issue involves an insurance policy that Stafford put into effect on March 10, 1964, under which respondent would pay two-thirds of the cost and the drivers the other third through payroll deductions. Stafford did not consult the Union about this plan even though bargaining sessions were then taking place. A similar plan had been announced in May 1963 and posted in June 1963 but failed to carry because too few drivers signed up.

In the present case, the Board found that Stafford's discharge of Immel and Becker for speeding was a pretext, and that they were actually discharged for their Union activities. The Board also found that Stafford's unilateral dealing with its employees about an insurance plan illegally bypassed the Union. Accordingly the Board concluded that Stafford had violated Sections 8(a) (1), 8(a) (3) and 8(a) (5) of the Act. A typical cease and desist order was entered, and Stafford was also directed to reinstate Immel and Becker with back pay and to bargain in good faith with the Union with respect to insurance and other conditions of employment and to post a notice embodying the terms of the Board's order.

### Discharges of Drivers Immel and Becker

As to the discharges of employees Immel and Becker, Stafford asserts that Section 10(b) of the Act prevents the consideration of any evidence more than six months prior to the July 28, 1964, charge filed by the Union with the Board. In this case, that would prevent the consideration of evidence before January 28, 1964.

■ Section 10(b) of the Act provides in pertinent part (29 U.S.C. § 160(b)):

> *"Provided,* That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made * * *"* (29 U.S.C.A. § 160(b)).

Section 10(b) was construed in Local Lodge No. 1424, International Association of Machinists et al. v. National Labor Relations Board (Bryan Manufacturing Co.), 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed. 2d 832. The Supreme Court rejected the Board's argument that Section 10(b) is merely a statute of limitations and not a rule of evidence. However, the Court held that "where occurrences within the six-month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices * * * earlier events may be utilized to shed light on the true character of mat-

ters occurring within the limitations period" (362 U.S. at p. 416, 80 S.Ct. at p. 826). In the present case, the discharges of these two employees occurred on January 30, 1964, and were within the six-month limitation period. Since those discharges might themselves constitute unfair labor practices, under the *Bryan Manufacturing* case it is permissible to consider earlier evidence, such as involved in *Stafford I*.

In *Stafford I*, respondent did not challenge the Board's finding that in violation of Section 8(a) (1), Stafford had interrogated and threatened Immel and Becker and other employees because of their Union activities and had threatened to enforce Company rules more strictly and to discharge any employees for any infraction thereof if the Union became their bargaining representative. There this Court agreed with the Board that Immel's first discharge was because of his Union organizational activities rather than for any health reasons and was in violation of Section 8(a) (3). There is no need to repeat here the above-outlined evidence concerning Immel's Union activities. (See also 359 F.2d at pp. 831–832; 150 N.L.R.B. at pp. 1040–1042, 1045–1048, 1050–1051.)

In *Stafford I*, Becker testified that on June 22, 1963, the date of the first Union organization meeting, Jack Stafford asked Becker whether he planned to attend. Mr. Stafford told Becker that if his employees wanted hospitalization insurance, he would send someone to see them the next day to sign them up. With respect to unionization, Mr. Stafford admitted that he told Becker that "nobody [was] going to run [his] outfit." Mr. Stafford also admitted that he told several of his employees that if they joined the Union, those who did not live up to his "strict rules * * * were all done." Becker told Mr. Stafford the drivers would not "buy" a deal with him, and that Becker would have to go along with the drivers. He and Immel testified against respondent in *Stafford I* in October 1963.

Becker was rehired on August 23, 1963, and Immel in November 1963. On January 8, 1964, the Board included the disputed ballots of Becker and Immel in its tally resulting in a certification of the Union on January 8, 1964. Just three weeks thereafter, namely, on January 30th, Stafford discharged Immel and Becker on the ground that they had violated the Company's 50-mile per hour speed limitation. We agree with the Board that these discharges were not predicated solely on valid grounds, so that the discharges were invalid under the Act. National Labor Relations Board v. Mid-West Towel & Linen Service, Inc., 339 F.2d 958, 962 (7th Cir. 1964); National Labor Relations Board v. Symons Manufacturing Co., 328 F.2d 835, 837 (7th Cir. 1964).

In any event, we approve the Board's determination that Stafford used the speeding by Immel and Becker as a pretext to cover their discharges for having successfully helped to obtain representative status for the Union. Thus it should be noted that Stafford assigned these two men to drive its truck 15, knowing that the improper gearing of that truck made it impossible to be driven at 50 miles per hour without causing excessive engine wear. Stafford's 50-mile per hour speeding rule was therefore considered by respondent's drivers to be inapplicable to truck 15. Drivers Walker and Wakeman had previously been assigned to truck 15 and had not been discharged for speeding. Mr. Stafford knew that Walker exceeded the 50-mile speed limit on truck 15 but did not discharge him. Although four drivers (Leonard, Crossman, Linkford and Rosen) had previously been fired for speeding on other trucks of Stafford, only Immel and Becker were fired for speeding on faulty truck 15. Another driver, Lowitz, had been discharged in August 1963, allegedly because of a poor driving record, but in *Stafford I* this Court concluded that his discharge was actually for his Union activities (359 F.2d at pp. 831, 833). As also determined in *Stafford I,* respondent expressed no concern for enforcing any speeding rule

until the June 1963 attempt to unionize the drivers. At that time, Immel's driving record was found to be satisfactory, and Becker's driving record was so satisfactory that it was not even investigated (150 N.L.R.B. at p. 1049).

Mr. Stafford admitted that he never gave notices to Becker and Immel about speeding with truck 15, on the ground that he "didn't have to." Until after the unionization effort was successful, neither Immel nor Becker was discharged this second time.[2] Moreover, the examiner found that Jack Stafford had never warned Becker or Immel of the possibility of their discharge for violating his speed limitation, even though he knew from their records that they had been driving truck 15 at 55 miles per hour since the middle of December 1963.

Stafford never explained why in December 1963 these two drivers were both assigned to truck 15, the only truck that had to be driven at 55 miles per hour to avoid high engine wear. Normally Stafford drivers were assigned to separate trucks. Even Stafford's brief before us concedes that Immel's and Becker's assignment to truck 15 could cause "some suspicion of unlawful motives"; it neglects to answer the Board's question "Why were both Becker and Immel almost simultaneously selected to drive truck 15?" The tachometer[3] on truck 15 had a notice that the governed speed for its engine was actually 2350 RPM, and Messrs. Immel and Becker operated the engine at the prescribed 10 percent below that.

One of driver Huber's tachographs was introduced to show that he had driven truck 15 at 50 miles per hour on January 23, 1964, during the same period as Immel and Becker were driving it. However, this tachograph shows that it was for "Bob Huber #10", showing that it had been taken from Mack truck No. 10 that had been driven by Huber. Furthermore, in January 1964 Becker and Immel were operating truck 15, not Huber. Other tachographs of Huber for truck 15, antedating and postdating Immel's and Becker's service thereon, indicate that Huber drove it at 50 miles per hour. There was no testimony credited by the examiner or Board that truck 15 could be operated properly at that speed. Stafford's officials knew that truck 15 was geared too fast and needed repairs to be driven at the proper engine speed and still observe the company's 50-mile per hour limit.

On the day prior to his discharge, Becker had driven truck 6. Upon his discharge, Becker asked Jack Stafford for the tachograph from truck No. 6 to show that he had not driven it in excess of 50 miles per hour, but Mr. Stafford refused to produce the tachograph. The representative of the Board's General Counsel requested Stafford to produce the tachographs for January 1965 to show whether truck No. 15 was still running over 50 miles an hour but was advised by Stafford that such cards had been destroyed.

■ Stafford complains that the Board's conclusion that the two discharges were discriminatory disturbed the examiner's credibility resolutions. Thus Stafford asserts that the examiner rejected the credibility of Immel's and Becker's testimony. This is not so. Of course, it is conceded that truck No. 15 could be driven at 50 miles per hour in 9th gear.[4] The point is that it could not be properly driven in 9th gear at 50 miles per hour and simultaneously at the required RPM. In fact, the examiner accepted Immel's and Becker's testimony that at the proper motor speed of 2100

2. Their prior discharges are discussed in *Stafford I*.

3. A tachometer is a device that automatically records on a disc (known as a tachograph) the time, speed and distance traveled by the truck. A tachometer was attached to each of Stafford's trucks.

4. Mr. Stafford said truck 15 could be operated at 50 miles per hour in 8th gear, but the credited testimony shows it would only go 45 miles per hour in that gear at the recommended RPM.

RPM, the truck would have to be running at a speed of 55 miles per hour. The examiner believed Immel's testimony that the tachometer on truck No. 15 showed that the governed speed for the motor was 2350 RPM. Immel, Becker and Walker all operated truck No. 15 at the prescribed 10 percent below the 2350 RPM. Upon analysis, a comparison of the Board's and the trial examiner's decisions shows that the Board only disagreed with the examiner as to inferences to be drawn from the established facts. This was of course the Board's prerogative. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456; cf. Plastic Workers Union Local 18, etc. v. National Labor Relations Board, 369 F.2d 226 (7th Cir. 1966).

■ In its Answer before the Board, Stafford relied upon the Wisconsin Industrial Commission's conclusion that Immel and Becker had been discharged for speeding and therefore were not entitled to unemployment compensation. Respondent did not renew this defense here, apparently recognizing that the Board does not give binding weight to unemployment compensation rulings of State Commissions. Matter of William Davies Co., Inc., 37 NLRB 631, 643, note 12 (1941); Matter of Horn Manufacturing Company, Inc., 83 NLRB 1177, note 4 (1949). The Board even holds that a court's judgment or decree in a suit between private parties is not binding upon the Board in a later proceeding to which the Board is a party. "This result is proper not only because of the difference of parties but also because of the congressional intent that primary responsibility for enforcing policies of the Act shall be in the Board and not in the courts." 2 Davis, Administrative Law Treatise (1958) § 18.11, and cases cited; Note, "Effect of Court Decree of Specific Performance upon Power of National Labor Relations Board to Invalidate Contract", 47 Yale Law Journal 799 (1938). The Board was not represented before the Wisconsin Commission, nor did that tribunal consider Stafford's pos-

sible violations of the National Labor Relations Act. The National Act was not even mentioned in these decisions of the Wisconsin Commission, and original jurisdiction under that Act has been committed by Congress exclusively to the Board. Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 48, 58 S.Ct. 459, 82 L.Ed. 638.

■ Even though in a trial *de novo* we might have concluded that respondent no longer bore an anti-union animus toward Immel and Becker and that their discharge was genuinely for cause, the foregoing review shows that the Board could conclude otherwise. Therefore, its holding that their discharge violated Sections 8(a) (1) and 8(a) (3) may not be disturbed. National Labor Relations Board v. Symons Manufacturing Co., 328 F.2d 835, 837 (7th Cir. 1964).

*Insurance Program*

■ The Board also found that Stafford violated Sections 8(a) (1) and 8(a) (5) of the Act by unilaterally instituting an insurance program. Stafford claims that the complaint as to this issue is barred by the six-month limitation in Section 10(b) of the Act, supra. However, the original, timely charge filed by the Union with the Board complained not only of the violations discussed in the foregoing part of this opinion, but also complained of "other acts and conduct * * * within the meaning of" Section 8(a) (5) of the Act dealing with refusals to bargain. The second amended charge specifically focused on the inauguration of the insurance program. The purpose of the charge is merely to set in motion the machinery of an inquiry by the Board. National Labor Relations Board v. Fant Milling Co., 360 U.S. 301, 307, 79 S.Ct. 1179, 3 L.Ed.2d 1243; Texas Industries, Inc. v. National Labor Relations Board, 336 F.2d 128, 132 (5th Cir. 1964). Consistently with the original charge, as amended, the November 17, 1964, complaint before the Board alleged that Stafford's March 10, 1964, unilateral institution of an insurance program violated the Act. Because the original

charge put Stafford on notice that the Union was claiming a refusal to bargain violation of Section 8(a) (5), it was permissible for the second amended charge to relate back and define more precisely the original, timely charge. National Labor Relations Board v. Gaynor News Co., 197 F.2d 719, 721 (2d Cir. 1952), affirmed, Radio Officers Union of Commercial Telegraphers Union v. N. L. R. B., 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455; National Labor Relations Board v. Epstein, 203 F.2d 482, 485 (3d Cir. 1953), certiorari denied 347 U.S. 912, 74 S.Ct. 474, 98 L.Ed. 1068. Respondent relies on National Labor Relations Board v. Vare, 206 F.2d 543, 546, 548 (3d Cir. 1953), but there the amended charge against the company was "in reality an orginal charge," and the amended charge against the Union "accused it of new and different unfair labor practices." In contrast, the amended charges here were not "new and different charges alleging new and different unfair labor practices."

Although the Board's General Counsel's representative indicated at the administrative hearing that he was "not going to try a refusal to bargain case," his immediately ensuing questioning of witnesses shows that he did not intend to abandon that portion of the complaint dealing with the unilateral institution of an insurance program on March 10th, which would automatically amount to a refusal to bargain under Section 8(a) (5). National Labor Relations Board v. Katz, 369 U.S. 736, 743, 82 S.Ct. 1107, 8 L.Ed.2d 230.

In May 1963, shortly before the Union organization activity resulting in its January 1964 certification, Jack Stafford offered his drivers an insurance program with the Company paying two-thirds of the cost of the plan and the drivers the remainder through payroll deductions. A notice to this effect was posted on June 27th but was later removed from the wall and the insurance plan was never put into effect, because too few drivers signed for it.

In February 1964, the Union first met with Stafford in an effort to negotiate a collective bargaining agreement. At the second bargaining session in that month, the Union representative requested a fully paid insurance program.

On March 5th, driver Huber, purportedly writing on behalf of all the drivers, sent a letter to Jack Stafford asking for a March 7th meeting with him. At that meeting, the eight drivers who attended asked Mr. Stafford to secure insurance for them. On March 10th, without consulting the Union, Mr. Stafford instituted the same contributory plan that he had offered during the previous summer. This time all but one of his drivers signed up for the plan.

On March 16th, Stafford proposed to the Union a fully paid insurance program and no wage increases. The first time the Union was notified of the accomplishment of the March 10th plan was at an April 7th bargaining session. At the June 2nd final bargaining session, Mr. Stafford announced that his drivers were satisfied with his contributory insurance plan and "that's all they wanted."

■ Unquestionably, Stafford's March 10th unilateral institution of an insurance program violated its duty to bargain in good faith with the Union upon terms and conditions of employment. National Labor Relations Board v. Crompton-Highland Mills, 337 U.S. 217, 223–225, 69 S.Ct. 960, 93 L.Ed. 1320; National Labor Relations Board v. Central Illinois Public Service Co., 324 F.2d 916 (7th Cir. 1963). Unilateral actions like this undermine a Union's authority and tend to destroy the collective bargaining relationship. Indeed, at the final bargaining session, Stafford used its unilateral action as an excuse for discussing nothing further with the Union. Accordingly, the Board's conclusion that Stafford violated Sections 8(a) (1) and 8(a) (5) of the Act was justified.

For these reasons, the Board's order is enforced in full.